## CLACKAMAS GASTROENTEROLOGY ASSOCIATES, P. C. *v.* WELLS

No. 01–1435.   Argued February 25, 2003—Decided April 22, 2003

STEVENS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, KENNEDY, SOUTER, and THOMAS, JJ., joined. GINSBURG, J., filed a dissenting opinion, in which BREYER, J., joined, *post*, p. 451.

*Steven W. Seymour* argued the cause for petitioner. With him on the briefs was *Andria C. Kelly.*

*Irving L. Gornstein* argued the cause for the United States et al. as *amici curiae* urging reversal. With him on the brief were *Solicitor General Olson, Deputy Solicitor General Clement, Philip B. Sklover, Lorraine C. Davis,* and *Robert J. Gregory.*

*Craig A. Crispin* argued the cause and filed a brief for respondent.*

JUSTICE STEVENS delivered the opinion of the Court.

The Americans with Disabilities Act of 1990 (ADA or Act), 104 Stat. 327, as amended, 42 U. S. C. § 12101 *et seq.*, like other federal antidiscrimination legislation,[1] is inapplicable to very small businesses. Under the ADA an "em-

---

*Briefs of *amici curiae* urging affirmance were filed for the American Federation of Labor and Congress of Industrial Organizations by *Jonathan P. Hiatt, James B. Coppess,* and *Laurence Gold;* for the Lawyers' Committee for Civil Rights Under Law et al. by *Barbara R. Arnwine, Thomas J. Henderson, Michael L. Foreman, Daniel B. Kohrman, Melvin Radowitz, Vincent A. Eng, Dennis C. Hayes,* and *Judith L. Lichtman;* and for the National Employment Lawyers Association et al. by *Merl H. Wayman* and *Jenifer Bosco.*

[1] See, *e. g.,* 29 U. S. C. § 630(b) (setting forth a 20-employee threshold for coverage under the Age Discrimination in Employment Act of 1967 (ADEA)); 42 U. S. C. § 2000e(b) (establishing a 15-employee threshold for coverage under Title VII of the Civil Rights Act of 1964).

ployer" is not covered unless its work force includes "15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year." § 12111(5). The question in this case is whether four physicians actively engaged in medical practice as shareholders and directors of a professional corporation should be counted as "employees."

I

Petitioner, Clackamas Gastroenterology Associates, P. C., is a medical clinic in Oregon. It employed respondent, Deborah Anne Wells, as a bookkeeper from 1986 until 1997. After her termination, she brought this action against the clinic alleging unlawful discrimination on the basis of disability under Title I of the ADA. Petitioner denied that it was covered by the Act and moved for summary judgment, asserting that it did not have 15 or more employees for the 20 weeks required by the statute. It is undisputed that the accuracy of that assertion depends on whether the four physician-shareholders who own the professional corporation and constitute its board of directors are counted as employees.

The District Court, adopting the Magistrate Judge's findings and recommendation, granted the motion. Relying on an "economic realities" test adopted by the Seventh Circuit in *EEOC* v. *Dowd & Dowd, Ltd.*, 736 F. 2d 1177, 1178 (1984), the District Court concluded that the four doctors were "more analogous to partners in a partnership than to shareholders in a general corporation" and therefore were "not employees for purposes of the federal antidiscrimination laws." App. 89.

A divided panel of the Court of Appeals for the Ninth Circuit reversed. Noting that the Second Circuit had rejected the economic realities approach, the majority held that the use of any corporation, including a professional corporation, "'precludes any examination designed to determine whether the entity is in fact a partnership.'" 271 F. 3d 903, 905

(2001) (quoting *Hyland* v. *New Haven Radiology Associates, P. C.*, 794 F. 2d 793, 798 (CA2 1986)). It saw "no reason to permit a professional corporation to secure the 'best of both possible worlds' by allowing it both to assert its corporate status in order to reap the tax and civil liability advantages and to argue that it is like a partnership in order to avoid liability for unlawful employment discrimination." 271 F. 3d, at 905. The dissenting judge stressed the differences between an Oregon physicians' professional corporation and an ordinary business corporation,[2] and argued that Congress'

---

[2] The dissenting judge summarized Oregon's treatment of professional corporations as follows:

"In Oregon, a physicians' professional corporation, like this one, preserves the professional relationship between the physicians and their patients, as well as the standards of conduct that the medical profession requires. Or. Rev. Stat. §58.185(2). Further, '*a shareholder of the corporation is personally liable as if the shareholder were rendering the service or services as an individual*' with respect to all claims of negligence, wrongful acts or omissions, or misconduct committed in the rendering of professional services. Or. Rev. Stat. §58.185(3) (emphasis added). A licensed professional also is *jointly and severally liable* for such claims, albeit with some dollar limitations. Or. Rev. Stat. §58.185(4)–(9). Ordinary business corporation rules apply only to other aspects of the entity, apart from the provision of professional services. Or. Rev. Stat. §58.185(11). A professional corporation's activities must remain consistent with the requirements of the type of license in question, Or. Rev. Stat. §58.205, and it may merge only with other professional corporations, Or. Rev. Stat. §58.196, so the provision of professional services—with its attendant liabilities—must remain at the heart of a P. C. like this defendant.

"Additional special rules apply to professional corporations that are organized to practice medicine, none of which apply to ordinary business corporations. A majority of the directors, the holders of the majority of shares, and all officers except the secretary and treasurer must be Oregon-licensed physicians. Or. Rev. Stat. §58.375(1)(a)–(c). The Board of Medical Examiners is given express statutory authority to require more than a majority of shares, and more than a majority of director positions, to be held by Oregon-licensed physicians. Or. Rev. Stat. §58.375(1)(d) & (e). The Board of Medical Examiners also may *restrict the corporate powers* of a professional corporation organized for the purpose of practicing medicine, beyond the restrictions imposed on ordinary business corpora-

reasons for exempting small employers from the coverage of the Act should apply to petitioner. *Id.*, at 906–909 (opinion of Graber, J.).

We granted certiorari to resolve the conflict in the Circuits, which extends beyond the Seventh and the Second Circuits.[3]  536 U. S. 990 (2002).

## II

"We have often been asked to construe the meaning of 'employee' where the statute containing the term does not helpfully define it." *Nationwide Mut. Ins. Co.* v. *Darden*, 503 U. S. 318, 322 (1992). The definition of the term in the ADA simply states that an "employee" is "an individual employed by an employer." 42 U. S. C. § 12111(4). That surely qualifies as a mere "nominal definition" that is "completely circular and explains nothing." *Darden*, 503 U. S., at 323. As we explained in *Darden*, our cases construing similar language give us guidance on how best to fill the gap in the statutory text.

In *Darden* we were faced with the question whether an insurance salesman was an independent contractor or an "employee" covered by the Employee Retirement Income Security Act of 1974 (ERISA). Because ERISA's definition of "employee" was "completely circular," 503 U. S., at 323, we followed the same general approach that we had previously used in deciding whether a sculptor was an "employee" within the meaning of the Copyright Act of 1976, see *Community for Creative Non-Violence* v. *Reid*, 490 U. S. 730

---

tions.  Or. Rev. Stat. § 58.379.  Lastly, Or. Rev. Stat. §§ 58.375 through 58.389 contain impediments to the transfer of shares and other corporate activities."  271 F. 3d, at 907–908 (opinion of Graber, J.) (footnote omitted).

[3] The disagreement in the Circuits is not confined to the particulars of the ADA.  For example, the Seventh Circuit's decision in *EEOC* v. *Dowd & Dowd, Ltd.*, 736 F. 2d 1177 (1984), concerned Title VII, and the Second Circuit's opinion in *Hyland* v. *New Haven Radiology Associates, P. C.*, 794 F. 2d 793 (1986), involved the ADEA.  See also *Devine* v. *Stone, Leyton & Gershman, P. C.*, 100 F. 3d 78 (CA8 1996) (Title VII case).

(1989),[4] and we adopted a common-law test for determining who qualifies as an "employee" under ERISA.[5] Quoting *Reid*, 490 U. S., at 739–740, we explained that "'when Congress has used the term "employee" without defining it, we have concluded that Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine.'" *Darden*, 503 U. S., at 322–323.

Rather than looking to the common law, petitioner argues that courts should determine whether a shareholder-director of a professional corporation is an "employee" by asking whether the shareholder-director is, in reality, a "partner." Brief for Petitioner 9, 15–16, 21 (arguing that the four shareholders in the clinic are more analogous to partners in a partnership than shareholders in a corporation and that

---

[4] In *Reid*, 490 U. S., at 738, the ownership of a copyright in a statue depended on whether it had been "'prepared by an employee within the scope of his or her employment'" within the meaning of the Copyright Act of 1976.

[5] *Darden* described the common-law test for determining whether a hired party is an employee as follows:

"'[W]e consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.'" 503 U. S., at 323–324 (quoting *Community for Creative Non-Violence* v. *Reid*, 490 U. S. 730, 751–752 (1989), and citing Restatement (Second) of Agency § 220(2) (1958)).

These particular factors are not directly applicable to this case because we are not faced with drawing a line between independent contractors and employees. Rather, our inquiry is whether a shareholder-director is an employee or, alternatively, the kind of person that the common law would consider an employer.

"those who are properly classified as partners are not 'employees' for purposes of the anti-discrimination statutes"). The question whether a shareholder-director is an employee, however, cannot be answered by asking whether the shareholder-director appears to be the functional equivalent of a partner. Today there are partnerships that include hundreds of members, some of whom may well qualify as "employees" because control is concentrated in a small number of managing partners. Cf. *Hishon* v. *King & Spalding*, 467 U. S. 69, 79, n. 2 (1984) (Powell, J., concurring) ("[A]n employer may not evade the strictures of Title VII simply by labeling its employees as 'partners'"); *EEOC* v. *Sidley Austin Brown & Wood*, 315 F. 3d 696, 709 (CA7 2002) (Easterbrook, J., concurring in part and concurring in judgment); *Strother* v. *Southern California Permanente Medical Group*, 79 F. 3d 859 (CA9 1996). Thus, asking whether shareholder-directors are partners—rather than asking whether they are employees—simply begs the question.

Nor does the approach adopted by the Court of Appeals in this case fare any better. The majority's approach, which paid particular attention to "the broad purpose of the ADA," 271 F. 3d, at 905, is consistent with the statutory purpose of ridding the Nation of the evil of discrimination. See 42 U. S. C. § 12101(b).[6] Nevertheless, two countervailing considerations must be weighed in the balance. First, as the

---

[6] The meaning of the term "employee" comes into play when determining whether an individual is an "employee" who may invoke the ADA's protections against discrimination in "hiring, advancement, or discharge," 42 U. S. C. § 12112(a), as well as when determining whether an individual is an "employee" for purposes of the 15-employee threshold. See § 12111(5)(A); see also Brief for United States et al. as *Amici Curiae* 10–11; *Schmidt* v. *Ottawa Medical Center, P. C.*, 322 F. 3d 461 (CA7 2003). Consequently, a broad reading of the term "employee" would—consistent with the statutory purpose of ridding the Nation of discrimination—tend to expand the coverage of the ADA by enlarging the number of employees entitled to protection and by reducing the number of firms entitled to exemption.

dissenting judge noted below, the congressional decision to limit the coverage of the legislation to firms with 15 or more employees has its own justification that must be respected— namely, easing entry into the market and preserving the competitive position of smaller firms. See 271 F. 3d, at 908 (opinion of Graber, J.) ("Congress decided 'to spare very small firms from the potentially crushing expense of mastering the intricacies of the antidiscrimination laws, establishing procedures to assure compliance, and defending against suits when efforts at compliance fail'" (quoting *Papa* v. *Katy Industries, Inc.*, 166 F. 3d 937, 940 (CA7), cert. denied, 528 U. S. 1019 (1999))). Second, as *Darden* reminds us, congressional silence often reflects an expectation that courts will look to the common law to fill gaps in statutory text, particularly when an undefined term has a settled meaning at common law. Congress has overridden judicial decisions that went beyond the common law in an effort to correct "'the mischief'" at which a statute was aimed. See 503 U. S., at 324–325.

Perhaps the Court of Appeals' and the parties' failure to look to the common law for guidance in this case stems from the fact that we are dealing with a new type of business entity that has no exact precedent in the common law. State statutes now permit incorporation for the purpose of practicing a profession, but in the past "the so-called learned professions were not permitted to organize as corporate entities." 1A W. Fletcher, Cyclopedia of the Law of Private Corporations § 112.10 (rev. ed. 1997–2002). Thus, professional corporations are relatively young participants in the market, and their features vary from State to State. See generally 1 B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders ¶ 2.06 (7th ed. 2002) (explaining that States began to authorize the creation of professional corporations in the late 1950's and that the momentum to form professional corporations grew in the 1970's).

Nonetheless, the common law's definition of the master-servant relationship does provide helpful guidance. At common law the relevant factors defining the master-servant relationship focus on the master's control over the servant. The general definition of the term "servant" in the Restatement (Second) of Agency § 2(2) (1957), for example, refers to a person whose work is "controlled or is subject to the right to control by the master." See also *id.*, § 220(1) ("A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control"). In addition, the Restatement's more specific definition of the term "servant" lists factors to be considered when distinguishing between servants and independent contractors, the first of which is "the extent of control" that one may exercise over the details of the work of the other. *Id.*, § 220(2)(a). We think that the common-law element of control is the principal guidepost that should be followed in this case.

This is the position that is advocated by the Equal Employment Opportunity Commission (EEOC), the agency that has special enforcement responsibilities under the ADA and other federal statutes containing similar threshold issues for determining coverage. It argues that a court should examine "whether shareholder-directors operate independently and manage the business or instead are subject to the firm's control." Brief for United States et al. as *Amici Curiae* 8. According to the EEOC's view, "[i]f the shareholder-directors operate independently and manage the business, they are proprietors and not employees; if they are subject to the firm's control, they are employees." *Ibid.*

Specific EEOC guidelines discuss both the broad question of who is an "employee" and the narrower question of when partners, officers, members of boards of directors, and major shareholders qualify as employees. See 2 Equal Employment Opportunity Commission, Compliance Manual

§§ 605:0008–605:00010 (2000) (hereinafter EEOC Compliance Manual).[7] With respect to the broad question, the guidelines list 16 factors—taken from *Darden,* 503 U. S., at 323–324—that may be relevant to "whether the employer controls the means and manner of the worker's work performance." EEOC Compliance Manual § 605:0008, and n. 71.[8] The guidelines list six factors to be considered in answering the narrower question, which they frame as "whether the individual acts independently and participates in managing the organization, or whether the individual is subject to the organization's control." *Id.,* § 605:0009.

We are persuaded by the EEOC's focus on the common-law touchstone of control, see *Skidmore* v. *Swift & Co.,* 323 U. S. 134, 140 (1944),[9] and specifically by its submission that each of the following six factors is relevant to the inquiry whether a shareholder-director is an employee:

"Whether the organization can hire or fire the individual or set the rules and regulations of the individual's work

---

[7] The EEOC's manual states that it applies across the board to other federal antidiscrimination statutes. See EEOC Compliance Manual § 605:0001 ("This Section discusses coverage, timeliness, and other threshold issues to be considered when a charge is first filed under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967 (ADEA), the Americans with Disabilities Act of 1990 (ADA), or the Equal Pay Act of 1963 (EPA)" (footnote omitted)).

[8] For example, the EEOC considers whether the work requires a high level of skill or expertise, whether the employer furnishes the tools, materials, and equipment, and whether the employer has the right to control when, where, and how the worker performs the job. *Id.,* § 605:0008.

[9] As the Government has acknowledged, see Tr. of Oral Arg. 19, the EEOC's Compliance Manual is not controlling—even though it may constitute a "body of experience and informed judgment" to which we may resort for guidance. *Skidmore* v. *Swift & Co.,* 323 U. S., at 140; see also *Christensen* v. *Harris County,* 529 U. S. 576, 587 (2000) (holding that agency interpretations contained in "policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law[,] do not warrant *Chevron*-style deference").

"Whether and, if so, to what extent the organization supervises the individual's work

"Whether the individual reports to someone higher in the organization

"Whether and, if so, to what extent the individual is able to influence the organization

"Whether the parties intended that the individual be an employee, as expressed in written agreements or contracts

"Whether the individual shares in the profits, losses, and liabilities of the organization." EEOC Compliance Manual § 605:0009.[10]

As the EEOC's standard reflects, an employer is the person, or group of persons, who owns and manages the enterprise. The employer can hire and fire employees, can assign tasks to employees and supervise their performance, and can decide how the profits and losses of the business are to be distributed. The mere fact that a person has a particular title—such as partner, director, or vice president—should not necessarily be used to determine whether he or she is an employee or a proprietor. See *ibid.* ("An individual's title . . . does not determine whether the individual is a partner, officer, member of a board of directors, or major shareholder, as opposed to an employee"). Nor should the mere existence of a document styled "employment agreement" lead inexorably to the conclusion that either party is an employee. See *ibid.* (looking to whether "the parties intended that the individual be an employee, as expressed in written

---

[10] The EEOC asserts that these six factors need not necessarily be treated as "exhaustive." Brief for United States et al. as *Amici Curiae* 9. We agree. The answer to whether a shareholder-director is an employee or an employer cannot be decided in every case by a "'shorthand formula or magic phrase.'" *Nationwide Mut. Ins. Co.* v. *Darden,* 503 U. S. 318, 324 (1992) (quoting *NLRB* v. *United Ins. Co. of America,* 390 U. S. 254, 258 (1968)).

agreements or contracts"). Rather, as was true in applying common-law rules to the independent-contractor-versus-employee issue confronted in *Darden*, the answer to whether a shareholder-director is an employee depends on " 'all of the incidents of the relationship . . . with no one factor being decisive.' " 503 U. S., at 324 (quoting *NLRB* v. *United Ins. Co. of America*, 390 U. S. 254, 258 (1968)).

## III

Some of the District Court's findings—when considered in light of the EEOC's standard—appear to weigh in favor of a conclusion that the four director-shareholder physicians in this case are not employees of the clinic. For example, they apparently control the operation of their clinic, they share the profits, and they are personally liable for malpractice claims. There may, however, be evidence in the record that would contradict those findings or support a contrary conclusion under the EEOC's standard that we endorse today.[11] Accordingly, as we did in *Darden*, we reverse the judgment of the Court of Appeals and remand the case to that court for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE GINSBURG, with whom JUSTICE BREYER joins, dissenting.

"There is nothing inherently inconsistent between the co-existence of a proprietary and an employment relationship." *Goldberg* v. *Whitaker House Cooperative, Inc.*, 366 U. S. 28, 32 (1961). As doctors performing the everyday work of petitioner Clackamas Gastroenterology Associates, P. C., the physician-shareholders function in several respects as

---

[11] For example, the record indicates that the four director-shareholders receive salaries, Tr. of Oral Arg. 8, that they must comply with the standards established by the clinic, App. 66, and that they report to a personnel manager, *ibid.*

common-law employees, a designation they embrace for various purposes under federal and state law. Classifying as employees all doctors daily engaged as caregivers on Clackamas' premises, moreover, serves the animating purpose of the Americans with Disabilities Act of 1990 (ADA or Act). Seeing no cause to shelter Clackamas from the governance of the ADA, I would affirm the judgment of the Court of Appeals.

An "employee," the ADA provides, is "an individual employed by an employer." 42 U. S. C. § 12111(4). Where, as here, a federal statute uses the word "employee" without explaining the term's intended scope, we ordinarily presume "Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine." *Nationwide Mut. Ins. Co.* v. *Darden,* 503 U. S. 318, 322–323 (1992) (internal quotation marks omitted). The Court today selects one of the common-law indicia of a master-servant relationship—control over the work of others engaged in the business of the enterprise—and accords that factor overriding significance. *Ante,* at 448. I would not so shrink the inquiry.

Are the physician-shareholders "servants" of Clackamas for the purpose relevant here? The Restatement defines "servant" to mean "an agent employed by a master to perform service in his affairs whose physical conduct in the performance of the service is controlled or is subject to the right to control by the master." Restatement (Second) of Agency § 2(2) (1957) (hereinafter Restatement). When acting as clinic doctors, the physician-shareholders appear to fit the Restatement definition. The doctors provide services on behalf of the corporation, in whose name the practice is conducted. See Ore. Rev. Stat. Ann. § 58.185(1)(a) (1998 Supp.) (shareholders of a professional corporation "render the specified professional services *of the corporation*" (emphasis added)). The doctors have employment contracts with Clackamas, App. 71, under which they receive salaries and

yearly bonuses, Tr. of Oral Arg. 8, and they work at facilities owned or leased by the corporation, App. 29, 71. In performing their duties, the doctors must "compl[y] with . . . standards [the organization has] established." *Id.*, at 66; see Restatement, ch. 7, tit. B, Introductory Note, p. 479 ("[F]ully employed but highly placed employees of a corporation . . . are not less servants because they are not controlled in their day-to-day work by other human beings. Their physical activities are controlled by their sense of obligation to devote their time and energies to the interests of the enterprise.").

The physician-shareholders, it bears emphasis, invite the designation "employee" for various purposes under federal and state law. The Employee Retirement Income Security Act of 1974 (ERISA), much like the ADA, defines "employee" as "any individual employed by an employer." 29 U. S. C. § 1002(6). Clackamas readily acknowledges that the physician-shareholders are "employees" for ERISA purposes. Tr. of Oral Arg. 6–7. Indeed, gaining qualification as "employees" under ERISA was the prime reason the physician-shareholders chose the corporate form instead of a partnership. See *id.*, at 7. Further, Clackamas agrees, the physician-shareholders are covered by Oregon's workers' compensation law, *ibid.*, a statute applicable to "person[s] . . . who . . . furnish services for a remuneration, subject to the direction and control of an employer," Ore. Rev. Stat. Ann. § 656.005(30) (1996 Supp.). Finally, by electing to organize their practice as a corporation, the physician-shareholders created an entity separate and distinct from themselves, one that would afford them limited liability for the debts of the enterprise. §§ 58.185(4), (5), (10), (11) (1998 Supp.). I see no reason to allow the doctors to escape from their choice of corporate form when the question becomes whether they are employees for purposes of federal antidiscrimination statutes.

Nothing in or about the ADA counsels otherwise. As the Court observes, the reason for exempting businesses with

fewer than 15 employees from the Act, was "to spare very small firms from the potentially crushing expense of mastering the intricacies of the antidiscrimination laws, establishing procedures to assure compliance, and defending against suits when efforts at compliance fail." *Ante*, at 447 (quotation from *Papa* v. *Katy Industries, Inc.*, 166 F. 3d 937, 940 (CA7 1999)). The inquiry the Court endorses to determine the physician-shareholders' qualification as employees asks whether they "ac[t] independently and participat[e] in managing the organization, or . . . [are] subject to the organization's control." *Ante*, at 449 (quoting 2 Equal Employment Opportunity Commission, Compliance Manual § 605:0009 (2000)). Under the Court's approach, a firm's coverage by the ADA might sometimes turn on variations in ownership structure unrelated to the magnitude of the company's business or its capacity for complying with federal prescriptions.

This case is illustrative. In 1996, Clackamas had 4 physician-shareholders and at least 14 other employees for 28 full weeks; in 1997, it had 4 physician-shareholders and at least 14 other employees for 37 full weeks. App. 55–62; see 42 U. S. C. § 12111(5) (to be covered by the Act, an employer must have the requisite number of employees "for each working day in each of 20 or more calendar weeks in the current or preceding calendar year"). Beyond question, the corporation would have been covered by the ADA had one of the physician-shareholders sold his stake in the business and become a "mere" employee. Yet such a change in ownership arrangements would not alter the magnitude of Clackamas' operation: In both circumstances, the corporation would have had at least 18 people on site doing the everyday work of the clinic for the requisite number of weeks.

The Equal Employment Opportunity Commission's approach, which the Court endorses, it is true, "excludes from protection those who are most able to control the firm's practices and who, as a consequence, are least vulnerable to the discriminatory treatment prohibited by the Act." Brief for

United States et al. as *Amici Curiae* 11; see 42 U. S. C. §§ 12111(8), 12112(a) (only "employees" are protected by the ADA). As this dispute demonstrates, however, the determination whether the physician-shareholders are employees of Clackamas affects not only whether they may sue under the ADA, but also—and of far greater practical import— whether employees like bookkeeper Deborah Anne Wells are covered by the Act. Because the character of the relationship between Clackamas and the doctors supplies no justification for withholding from clerical worker Wells federal protection against discrimination in the workplace, I would affirm the judgment of the Court of Appeals.